The following constitutes
the order of the court. Signed May 25, 2010

_____
Roger L. Efremsky
U.S. Bankruptcy Judge
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re | Case No. 07-52029-RLE |
| RAYMOND J. SIR, | Chapter 7 |
|         Debtor. | Adv. Proc. No. 07-5147 |

————————————————————/

AVI MUKHERJEE & KUMAR S. SRIPADAM,

        Plaintiffs,

vs.

RAYMOND J. SIR,

        Defendant.

————————————————————/

**MEMORANDUM DECISION AFTER TRIAL**

-1-

# I. Introduction and Procedural Posture

The court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

Raymond J. Sir ("Sir") filed this chapter 7 case on July 6, 2007. Plaintiffs Avi Mukherjee ("Mukherjee") and Kumar Sripadam ("Sripadam" and, with Mukherjee, "plaintiffs") timely filed the Complaint commencing this adversary proceeding on September 12, 2007.  The Complaint states one claim for relief under Bankruptcy Code § 523(a)(2)(A).  The other defendant initially named in the Complaint - chapter 7 debtor Global OEM Solutions, LLC ("GOEM") - was dismissed on the eve of trial.[1]

Through counsel, Sir answered the complaint, generally denying its allegations and raising affirmative defenses.  He responded to plaintiffs' discovery and was deposed.  Sir's counsel withdrew in September 2008 and was not replaced.  The case went to trial on January 5, 2010. Sir represented himself at trial and James Cai and Seth Weiner represented plaintiffs.

This is the court's decision following trial and constitutes its findings of fact and conclusions of law as required by Federal Rule of Bankruptcy

---

[1] GOEM was the debtor in chapter 7 case no. 07-52027 ASW. The case is now closed. Plaintiffs filed an adversary proceeding with identical allegations in the GOEM case which was dismissed at plaintiffs' request. See AP no. 07-5148. Plaintiffs have failed to submit an order dismissing it as requested by the court.

Procedure 7052.[2]

The gaps in the record in this case have created analytical problems which will be apparent in the discussion that follows. The problems stem in large part from the way plaintiffs' counsel presented the case and the fact that Sir had no counsel at trial. If there appear to be missing facts in what follows, it is not due to the court's oversight of any available facts.

**II. Relevant Facts**

    **A. Background Facts re Sir**

Sir testified that he had received a bachelor's degree from the University of California at Berkeley (with a major in biophysics) and had received an MBA from the University of California at Los Angeles. Tr. 72:6-8. Sir said he had been a "gambling addict" during the time relevant to this adversary proceeding and was now a recovering gambling addict.[3] Tr. 89:14-21; 90:1-5; 134:1-8; 141:15-19. He claimed he had lost millions of dollars gambling. Tr. 73:3-9. He is separated from his wife, unemployed, and living in southern California with his parents. Tr. 71:17-24; 73:3-6.

Sir formed GOEM in 1999 and it operated until it filed

---

[2] The following abbreviations will be used: "Tr." indicates the trial transcript; "Exh." indicates exhibit.

[3] There was no corroborating evidence for this self-diagnosis – other than the apparent gambling debts involved in here. The court notes that the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) of the American Psychiatric Association classifies pathological gambling as an impulse control disorder.

[sir.mukherjee.sripadam.final.memo.decis]   -3-

its chapter 7 case at the same time he filed this case in July 2007. Sir Docket no. 12, p. 5. At all times relevant to this adversary proceeding, Sir owned the controlling interest in GOEM and was its only manager. Exhs. 1-3. GOEM's statement of financial affairs described it as a "technology consulting company covering both hardware and software." GOEM Docket no. 11, p. 5. The trustee in the GOEM case filed a no asset report and a final decree was entered in December 2007. GOEM Docket no. 15.

Sir's schedules showed unsecured debt of approximately $1.3 million, no secured debt, and no priority debt. His schedule A listed no real property. Sir Docket no. 11. He apparently transferred his interest in what had been a jointly owned house to his ex-wife in June 2006 according to the terms of a marital property agreement entered into in September 2005. Sir Docket no. 12, p. 3; Exh. 21.[4] However, he resided in the home until September 2009 and the marriage has not been formally dissolved. Tr. 133:5-18. According to his statement of financial affairs, his income, derived solely from GOEM, was less than $10,000 in 2007, less than $54,000 in 2006, and less than $28,000 in 2005. Sir Docket no. 12, p. 1.

**B. Plaintiff Mukherjee's Testimony**

Mukherjee had been employed at IBM and Hitachi from 1978 to 2006. Tr. 40:8-17. There was no evidence at trial

---

[4] Sir listed $1.3 million in unsecured debt on his schedule F. Approximately $70,000 of this appears to be credit card debt. Approximately $715,000 of this appears to be two real property secured debts on what was Sir's home. Sir Docket no. 11.

[sir.mukherjee.sripadam.final.memo.decis]    -4-

regarding his educational background or what he had done at
IBM or Hitachi; the court assumes he was an engineer.  He met
Sir playing poker at Bay 101 in 2002 or 2003.  Tr. 7:21-25.
At all times relevant to this case, they both played there
regularly – at least several times a week.  Tr. 27:16-17.  He
had also been employed at Bay 101 in some capacity because he
was a regular player there and knew the owner.[5]  Tr. 30:8-15.
After retiring from Hitachi in 2006, Mukherjee formed Global
Tech Consultants, LLC ("GlobalTech").  Tr. 40:2-21.

Mukherjee testified that on September 4, October 14 and
December 17, 2005, he loaned Sir cash while they were together
at Bay 101.  Tr. 8:2-24.  Mukherjee said these three personal
loans, totaling $30,000, were used by Sir to play poker.  Tr.
8:2-24.  These loans were not supported by any contemporaneous
written documentation but Mukherjee believed there had been an
agreement to repay these loans within a month or less but they
had not been.  Tr. 9:1-7.

Mukherjee testified that even though the $30,000 loan had
not been repaid, in February 2006, Sir told him it would be in
his "best interest" to convert the unpaid $30,000 personal
loan into an investment in GOEM and to make an additional
investment of $70,000.  Tr. 9:22-25; 11:4-10.  He testified
that Sir told him that Sir controlled GOEM and that GOEM

---

[5] In his poker terminology, he would "get some
reimbursement of the rake" from Bay 101. Tr. 30:11-12. This
employment was not during the time relevant to this case. Tr.
30:21.

Case: 07-05147   Doc# 43   Filed: 05/25/10   Entered: 05/26/10 13:37:53   Page 5 of 30

controlled "significant hedge funds"[6] in Korea.  Tr.9:17-21.
Mukherjee claimed that Sir told him that this investment in
GOEM *could* provide a "significantly higher" return than any
other investment he *could* make - that it *could* be as high as
10 - 15%.  Tr. 10:3-7.

In February and March 2006, before the additional $70,000
was transferred, Mukherjee (or his LLC) and Sir (or GOEM)
entered into the following agreements:

1.  The "Consultant Retainer Agreement" ("Consultant
Agreement").  See Exh. 7.  The work to be performed by
Mukherjee was described as "assessing technology," "business
development," and "project management."  According to Exhibit
A to the Consultant Agreement, GOEM was to pay Mukherjee a fee
of $10,000 per month for this work plus a "net profit of 30%"
on two projects identified on Exhibit A.  Mukherjee testified
that this consulting arrangement was a way of repaying the
personal gambling loans and he performed the consulting
services on an almost full time basis for 3 months.  He claims
to be owed $30,000 for this work performed between March and
May 2006.

2.  The "Subscription Agreement and Suitability
Statement" ("Subscription Agreement").  See Exh. 5.  The
Subscription Agreement provided that Mukherjee "agrees to

---

[6] It is unclear what Mukherjee understood "hedge fund" to
mean. Black's Law Dictionary defines hedge fund as "a
specialized investment group - usu. organized as a limited
partnership or offshore investment company - that offers the
possibility of high returns through risky techniques such as
selling short or buying derivatives." Blacks Law Dictionary,
(8th ed. 2004).

Case: 07-05147   Doc# 43   Filed: 05/25/10   Entered: 05/26/10 13:37:53   Page 6 of 30

invest" $100,000 in GOEM and is to become a "limited partner."
The Subscription Agreement contains representations regarding
Mukherjee's "suitability" to make this investment and an
acknowledgment of the risks associated with it.  The key terms
of the Subscription Agreement include:

> The undersigned ... has such knowledge and experience in
> financial and business matters that he is capable of
> evaluating the merits and risks of an investment in the
> Company and the suitability of such investment in the
> Company ... is able to bear the economic risk of the
> investment ... has received no representations or
> warranties from the Company or the General Partner other
> than those contained in the Operating Agreement ...

See Exh. 5, p. 2-3.

   3.  As contemplated by the Subscription Agreement, the
Operating Agreement for GOEM dated March 26, 2006 shows that
GlobalTech became a member with a $100,000 investment and
acquired a 5% interest in GOEM (the Subscription Agreement and
the Operating Agreement, collectively, the "LLC Documents").
See Exh. 3.[7]

   Exhibit 17 is an undated and unsigned document prepared
by Mukherjee entitled "Loans and other payments to Raymond
Sir."  It lists the amounts and dates of each of Mukherjee's
transfers.  It shows the unpaid $30,000 "personal loan" made

---

   [7] Mukherjee testified that he transferred his personal
interest in these documents to his LLC, GlobalTech. The
documents are inconsistent. See Exh. 5, p. 55 listing
"Mukherjee c/o Globaltech" as the member of GOEM, and see Exh.
5, p. 56-57 listing Globaltech as the member. Mukherjee's
explanation for this transfer was that he wanted to use
Globaltech as the vehicle for this investment and for any
income to be received under the Consultant Agreement. Sir
testified that these decisions were Mukherjee's alone and he
had no interest in them or influence over them.

in three installments between September 4, 2005 and December
17, 2005.  This entry is followed by this statement:  "2/14/06
verbal agreement with RJ Sir to convert Loan to investment –
add $70k more for minimum unit of $100k.  Agree to pay $70k in
installments over 3 months."  The document then lists twelve
transfers in amounts ranging from $3,500 to $10,000 between
February 15, 2006 and May 12, 2006 and ends "total to date
$100k."  <u>See</u> Exh. 17.  Exhibit 17 also shows that, with one
exception, these twelve transfers were made in cash while the
parties were together at Bay 101.  The one exceptional
transfer was a wire transfer of $8,000 to Sir's account at the
Bellagio in Las Vegas where Sir was apparently playing poker.

       Mukherjee testified that he began asking for his money
back in May 2006 and learned at this time that there were two
lawsuits pending against Sir or GOEM.  Tr. 14:12-25.  Exhibit
13, an email from Sir to Mukherjee dated May 25, 2006,
indicates that, due to cash flow problems, GOEM was unable to
pay the $30,000 consulting fee but apparently did not dispute
that $30,000 was owed.  It also indicates that Sir offered to
"buy back" Mukherjee's interest in GOEM.

       In an email to Sir dated February 12, 2007, Mukherjee
summarized the history of his relationship with Sir:

>       You told me that, as I obviously saw with my own eyes,
>       the money I gave you for [GOEM] investment was in fact
>       lost at the gambling and poker tables at Bay 101 and
>       elsewhere ... You told me you would regard the money owed
>       as a personal loan – since obviously it went into poker
>       and gambling losses – and make me 'whole' ($130k)
>       personally.

<u>See</u> Exh. 12.

       The email goes on to describe Sir's apparent promise to

Case: 07-05147   Doc# 43   Filed: 05/25/10   Entered: 05/26/10 13:37:53   Page 8 of 30

1 fully repay the $130,000 by December 2006, his failure to do
2 so, his promise to begin making monthly payments starting in
3 January 2007, and an apparent failure to do that.  See Exh.
4 12.

5    **C. Plaintiff Sripadam's Testimony**

6    Sripadam described himself as a self-employed
7 "entrepreneur and business consultant."  Tr. 55:9-10.  He
8 stated he was on the board of directors of a "couple of
9 companies" and was working on a start-up of some kind.  Tr.
10 55:11-12.  There was no testimony regarding his educational
11 background and no details were offered on his business other
12 than as stated here.  Sripadam met Sir in 2005 at Bay 101
13 where he also played poker on a regular basis.  Tr. 55:13-20.
14 Sripadam had loaned money to Sir for poker playing in the past
15 but as of April 2006, all such loans had been repaid.  Tr.
16 63:12-23.

17    In April 2006, according to Sripadam, Sir told him that
18 GOEM had an opportunity to invest in a $1 million "mezzanine
19 deal" in South Korea involving an "ipo track company" whose
20 name Sripadam did not recall.  Sir said GOEM was going to
21 invest $300,000 in this deal, and invited Sripadam to invest
22 $100,000 of the $300,000.  Tr. 56:6-24.  Sripadam thereafter
23 delivered to GOEM a $100,000 cashiers check made payable to
24 GOEM.  Tr. 59:1-6.

25    Two documents were offered to support this transaction.
26 Exhibit 14 is an email string dated April 10 and April 11,
27 2006 between Sir and Sripadam in which Sir wrote:

28    I am inviting you to participate in a [m]ezzanine

[sir.mukherjee.sripadam.final.memo.decis]  -9-

financing deal with an IPO track company in Korea. This deal is through one of [the] premier Venture Capital companies, KTIC (Korean Technology Investment Corp[.]), www.ktic.co.kr in Korea. I have done numerous deals with this company [in the] last 6 years and they have a solid track record. Since this is [the] first deal for us, my company will guarantee the minimum return of 15% with the principle [sic] in 6 (six) months. In my experience, you can expect around 30% return on this deal in six months. I am making this deal a "No Risk" deal for you.

Id.

In response to this initial email, Sripadam asked for additional details and Sir responded with the name of the company ("the company name is 3sdigital...they are backed by Samsung and KTIC...") and suggested they arrange a meeting. See Exh. 14.

Two days later, on April 13, 2006, as president and CEO of GOEM, Sir signed a document addressed to Sripadam entitled Letter of Guarantee (the "Letter") and Sripadam delivered his $100,000 check. See Exh. 19. Sripadam testified that they had exchanged a draft of the Letter on which he had commented before it was finalized. Tr. 60:5-7. The Letter says Sripadam is making a "personal investment" of $100,000 for a "Mezzanine Financing Project"[8] in South Korea by and between GOEM and Korea Exchange Bank (defined as the "Investment") and GOEM is issuing its "irrevocable and unconditional letter

_____

[8] It is unclear what they understood this phrase to mean. Generally, mezzanine financing can be structured either as debt or equity and is often a more risky investment than secured lending. http://wikipedia.org/wiki/Mezzanine_financing.

[sir.mukherjee.sripadam.final.memo.decis]   -10-

of guarantee" in favor of Sripadam.[9] The next two paragraphs say:

> If the Investment fails to perform and fulfill the expected returns, *[w]e, as primary obligor and not merely as surety*, do hereby irrevocably and unconditionally guarantee, jointly and severally, to perform and fulfill the expected return rate *up to 15%* with the principal. We hereby irrevocably and unconditionally undertake to pay [Sripadam] immediately *if* the Investment fails to earn expected returns *up to 15%* upon [Sripadam's] simple demand with your [sic] signed statement certifying that the Investment was not returned with a *guarantee earning of 15%* by October 31st, 2006.

See Exh. 19 (emphasis added).

Sripadam acknowledged that he had done no due diligence regarding this transaction before he delivered his $100,000 to GOEM. Tr. 58:10-12. He testified that he suspected the $100,000 was used by Sir for gambling but acknowledged that it was possible it had been invested by GOEM. Tr. 69:1-22. On January 23, 2007, he sent a letter demanding immediate payment of $115,000 on the "note." See Exh. 15.

**D. Sir's Testimony re Mukherjee and Sripadam**

Sir admitted there was an unpaid $30,000 personal gambling debt owed to Mukherjee but denied that there was an intention to convert this $30,000 loan into an "investment" in GOEM. He also denied that the additional $70,000 given to him by Mukherjee was intended to be an "investment" in GOEM. Tr. 83:17-19; 85:20-24; 86:14-20; 88:14-25; 89:2-5. He viewed the $100,000 as a gambling debt. Tr. 89:2-21. He

---

[9] Exhibit 14 refers to Korean Technology Investment Corp. but the Letter refers to Korea Exchange Bank. This unexplained discrepancy may or may not be significant.

[sir.mukherjee.sripadam.final.memo.decis]  -11-

1  denied promising Mukherjee a 20% return - or any specific

2  return - on any investment. Tr. 91:13-18.

3      Sir's explanation for Mukherjee's 5% interest in GOEM

4  was that Mukherjee was experienced and knowledgeable in the

5  technology area, and because of his years at IBM and Hitachi,

6  had contacts that could prove beneficial to GOEM. Tr. 90:19-

7  25. Accordingly, while the testimony on this point was less

8  than clear, he apparently transferred a portion of his 90%

9  interest in GOEM to Mukherjee (or to Globaltech) so that

10  Mukherjee (or Globaltech) had a 5% interest and Sir then had

11  an 85% interest. Tr. 88:10-12; Exh. 2, p. 66; Exh. 3, p. 65.

12  In Sir's view of the transactions involved in this adversary

13  proceeding, the $100,000 gambling debt owed to Mukherjee and

14  the transfer of the 5% interest in GOEM were two entirely

15  separate issues. Tr. 90:19. Nonetheless, he testified that

16  he believed Mukherjee's true intention in obtaining the GOEM

17  interest was to secure repayment of his gambling debt. Tr.

18  86:14-20.

19      Sir also denied that GOEM owed consulting fees to

20  Mukherjee because the services provided were either without

21  benefit to GOEM or Mukherjee had made only insignificant

22  efforts to provide services. Tr. 94:2-5; Exh. 28, Response

23  to Request for Admission no. 8. However, he also

24  acknowledged that GOEM's accounts payable included a $30,000

25  debt to Mukherjee or Globaltech which GOEM had been unable to

26  pay. Tr. 6:1-5; 96:8-9; Exh. 13.

27      Sir denied he had misrepresented any facts and denied

28  any intent to deceive Mukherjee. Tr. 87:23-25. He claimed

[sir.mukherjee.sripadam.final.memo.decis]  -12-

that Mukherjee had known that his funds were going to be used for gambling rather than invested in GOEM. Tr. 13:17-19; 91:21-23. Sir acknowledged that he owed money to Mukherjee but the money had been lost gambling and he could not repay it. Tr. 5:20-25; 98:5-6. He also testified that at one point Mukherjee had tried to teach him to be a better poker player in order to minimize his losses. Tr. 90:7-10.

Sir stated that Sripadam's $100,000 had been used to "support general operations" of GOEM and was not used for "identifiable expenses." <u>See</u> Exh. 29, Response to Interrogatory no. 10. Sir denied that GOEM had invested any "capital" in investments "in which Korean Technology Investment Corp. had participated." <u>See</u> Exh. 29, Response to Interrogatory no. 19. At trial, Sir testified that Sripadam's $100,000 was deposited into GOEM's bank account and an equivalent amount had been allocated to some investment in Korea from GOEM's or his accounts there. Tr. 102:10-13; 105:11-14. Sir claimed that the full $300,000 had been lost when someone in Korea absconded with the funds.[10] The mezzanine financing project never took place. Tr. 104:22-24; 105:6-9; 111:3-4.

//

//

---

[10] GOEM's schedules and Sir's schedules are silent as to any such loss, perhaps because it occurred more than one year before either case was filed. Sir's explanation for the apparent disappearance of this $300,000 was murky at best. Nevertheless, plaintiffs failed to ask any relevant follow-up questions, and failed to present any documents regarding this aspect of their case.

[sir.mukherjee.sripadam.final.memo.decis]   -13-

## III.  Alter Ego Issue

Plaintiffs argue that Sir and GOEM must be treated as alter egos.  Through use of this alter ego doctrine, plaintiffs seek to hold Sir liable for the alleged obligations of GOEM.

At paragraph 5, the Complaint alleges, *inter alia*, that there was a "unity of ownership and interest" between Sir and GOEM, that "separateness between them has never existed," that there was "inadequate capitalization," "inadequate insurance," a failure to "respect corporate formalities," commingling of funds and assets.  Sir's Answer generally denied the allegations of paragraph 5.

Without citation to any authority, plaintiffs' trial brief asserted - in a similar conclusory fashion - that Sir controlled GOEM, conducted it without observing corporate formalities, and used its funds as his own to pay his gambling debts.  At trial Sir made no effort to refute this contention.

In general, the law regarding alter ego liability is easy to state but difficult to apply.  <u>Talbot v. Fresno-Pacific Corp</u>., 181 Cal. App. 2d 425, 432 (Cal. Ct. App. 1960).  When a corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the acts as if they were done by the individuals or by the controlling corporation. The doctrine is to be narrowly applied.  <u>Dole Food Co. v. Patrickson</u>, 538 U.S. 468, 475 (Cal. 2003) ("The doctrine of piercing the corporate veil, however, is the rare exception, applied in the case of fraud or certain other exceptional circumstances.")

[sir.mukherjee.sripadam.final.memo.decis]   -14-

1    Under California law, two conditions must be met before
2  the alter ego doctrine will be invoked.  First, there must be
3  such a unity of interest and ownership between the corporation
4  and its equitable owner that the separate personalities of the
5  corporation and the shareholder do not in reality exist.
6  Second, there must be an inequitable result if the acts in
7  question are treated as those of the corporation alone.
8  <u>Automotriz Del Golfo De California S.A. De C.V. v. Resnick</u>, 47
9  Cal. 2d 792, 796 (Cal. 1957); <u>Tomaselli v. Transamerica Ins.</u>
10 <u>Co.</u>, 25 Cal. App. 4th 1269, 1285 (Cal. Ct. App. 1994).
11 Difficulty in enforcing a judgment or collecting a debt does
12 not satisfy this inequitable result standard.  <u>Sonora Diamond</u>
13 <u>Corp. v. Superior Court</u>, 83 Cal. App. 4th 523, 539 (Cal. Ct.
14 App. 2000).  There must be some evidence of bad faith.
15 <u>Associated Vendors, Inc. v. Oakland Meat Co.</u>, 210 Cal. App. 2d
16 825, 842 (Cal. Ct. App. 1962).
17    Courts have considered numerous factors, including
18 inadequate capitalization, commingling of funds and other
19 assets of the two entities, the holding out by one entity that
20 it is liable for the debts of the other, identical equitable
21 ownership in the two entities, use of the same offices and
22 employees, use of one as a mere conduit for the affairs of the
23 other, disregard of corporate formalities, lack of segregation
24 of corporate records, and identical directors and officers.
25 <u>Tomaselli</u>, 25 Cal. App. 4th at 1285.
26    The incompleteness of the record in this case makes it
27 impossible to make a fair assessment of enough facts to reach a
28

[sir.mukherjee.sripadam.final.memo.decis]   -15-

1  sound conclusion on the issue of alter ego liability.[11]
2  Despite an opportunity to do so, plaintiffs failed to meet
3  their burden of proof.  Nonetheless, such a conclusion makes no
4  difference to the outcome of this case. For purposes of the
5  discussion that follows, the court will assume that Sir and
6  GOEM were alter egos.

7  **IV. Bankruptcy Code § 523(a)(2)(A)**

8      The central purpose of the Bankruptcy Code is to permit a
9  debtor to make peace with creditors and obtain a fresh start
10  free of preexisting debt.  Grogan v. Garner, 498 U.S. 279
11  (1991).  The bankruptcy discharge provides this fresh start.
12  To implement that purpose, the discharge is interpreted broadly
13  and the exceptions to discharge are interpreted narrowly in
14  favor of the debtor.  Snoke v. Riso (In re Riso), 978 F.2d
15  1151, 1154 (9th Cir. 1992); Su v. Carillo (In re Su), 259 B.R.
16  909, 912 (9th Cir. BAP 2001), *aff'd* 290 F.3d 1140 (9th Cir.
17  2002).  To maintain the integrity of the bankruptcy process, a
18  discharge must be limited to the honest but unfortunate debtor.
19  See Grogan, 498 U.S. at 286-87.

20      Bankruptcy Code § 523(a)(2) provides that a discharge
21  under Bankruptcy Code § 727 does not discharge an individual
22  debtor for any debt - (2) for money, property, services, or an

23  _____

24      [11] It is undisputed that Sir managed and owned the
25  controlling interest in GOEM. Plaintiffs stress that the GOEM
   bank records show that Sir withdrew cash from the GOEM bank
26  account and wrote checks to his wife which totaled at least
   $87,000 between December 2005 and December 2006. The franchise
27  tax board and what appear to be other GOEM trade creditors
   were also paid approximately $22,000 from this account during
28  this time period. See Exh. 20.

[sir.mukherjee.sripadam.final.memo.decis]   -16-

extension, renewal, or refinancing of credit, to the extent
obtained, by - (A) false pretenses, a false representation, or
actual fraud, other than a statement respecting the debtor's or
an insider's financial condition.

The Complaint alleges that the plaintiffs' debts are
nondischargeable on the grounds that the debtor obtained money
by false pretenses, a false representation and actual fraud.
In the Ninth Circuit, the terms "false pretenses" and "false
representation" have the same meaning in § 523(a)(2)(A) as the
term "actual fraud" and do not provide an independent basis for
finding a debt nondischargeable.  See Mandalay Resort Group v.
Miller (In re Miller), 310 B.R. 185 (Bankr. C.D. Cal. 2004)
(analyzing the history of the use of these terms in bankruptcy
law).

A creditor who seeks to establish nondischargeability on
the basis of actual fraud must prove (1) the debtor made a
representation; (2) at the time debtor knew the representation
was false; (3) debtor made the representation with the
intention of deceiving the creditor; (4) the creditor
justifiably relied on the representation; and (5) the creditor
sustained damage as the proximate result of the representation
having been made.  Citibank (South Dakota), N.A. v. Eashai (In
re Eashai), 87 F.3d 1082, 1086 (9th Cir. 1996); Britton v.
Price (In re Britton), 950 F.2d 602, 604 (9th Cir. 1991).
Plaintiff has the burden of proof as to each of these elements
by a preponderance of the evidence.  Grogan, 498 U.S. at 291.
//
//

[sir.mukherjee.sripadam.final.memo.decis]   -17-

**A. False Representation**

The Complaint alleges Sir made two representations to Mukherjee - that there would be a 20% return on a $100,000 investment in GOEM and that GOEM would pay Mukherjee $30,000 based on an agreement to pay him $10,000 per month as a consultant.  See Complaint at ¶7(b)[represent 20% return]; ¶7(d) [represent pay $10,000/month]; ¶7(j) [knew promise and representations false]; ¶7(l) [no intent to perform].

To prevail on a claim of actual fraud, Mukherjee must show that Sir made a false statement of fact in February 2006 and March 2006 when he allegedly promised a 20% return on an investment in GOEM and the LLC Documents and Consultant Agreement were signed.  In the alternative, he must show that Sir made some such promise with no intention of performing.

First, Mukherjee's contention that there was an investment of $100,000 in GOEM is simply not credible.  He handed $100,000 *in cash* to Sir while they were together playing poker or wired it to Sir while Sir was in Las Vegas playing poker.  He failed to prove that Sir misrepresented how these funds were going to be used.

Second, assuming (for purposes of discussion only) that there was an investment in GOEM rather than a loan to enable Sir to gamble, the LLC Documents do not represent there will be a specific return or promise a 20% return on any investment. The alleged oral representation by Sir of a 20% return from an investment in GOEM - which Sir denies making - contradicts the

1  terms of the LLC Documents.[12]

2      Third, assuming Mukherjee's theory is that Sir promised to
3  repay his alleged $100,000 investment in GOEM with a 20% return
4  (within some unspecified time frame), without an intention to
5  perform, Mukherjee also fails to establish this basis for the
6  first element of a § 523(a)(2)(A) claim.

7      A promise of future performance or intention is generally
8  not actionable as fraud at common law.  However, if the debtor
9  does not actually intend to honor the promise when it is made,
10  this lack of intention may support a fraud claim.  See, e.g.,
11  Desert Palace, Inc. v. Baumblit (In re Baumblit), 229 B.R. 50
12  (Bankr. E.D. N.Y. 1999), aff'd in part, rev'd in part on other
13  grounds, 251 B.R. 442 (E.D.N.Y. 2000).  Sir testified that
14  there was no investment in GOEM, and no promise of a 20% return
15  on any such investment.  Sir also testified that he intended to
16  repay Mukherjee and would have if he had been able to.
17  Mukherjee's summary of their relationship that is Exhibit 12
18  confirms this, as did Exhibit 13 and Sir's testimony at trial.
19  Thus, there was no proof that Sir made a promise without an
20  intention to perform.

21      Exhibit 17, the other document prepared by Mukherjee
22  regarding the background for the $100,000 in transfers, also

23

24  ────────────────

25      [12] Parole evidence is admissible with respect to issues of
    fraud, illegality or other invalidating causes. See Cal. Code
26  Civ. Pro. § 1856(g). But this fraud exception to the parole
    evidence rule does not apply where the evidence is offered to
27  show a promise directly at variance with a promise in the
    written agreement. Bank of America v. Pendergrass, 4 Cal. 2d
28  258, 263 (Cal. 1935).

[sir.mukherjee.sripadam.final.memo.decis]   -19-

cuts against Mukherjee on this point. It shows Mukherjee knew the first $30,000 was a loan made to enable Sir to gamble. It also shows Mukherjee knew the 12 transfers totaling $70,000 were going to be used by Sir to gamble at each point a transfer was made because it shows that the transfers were made while they were together at Bay 101 or while Sir was at the Bellagio in Las Vegas. Therefore, Mukherjee failed to prove that Sir made a false statement or representation regarding the use of the $100,000 at the times Sir received the money or at the time Sir and Mukherjee executed the LLC Documents. Based on this evidence, Mukhrejee also failed to prove there had been a promise made without the intention to perform.

The Complaint alleges that Sir represented that Sripadam would receive a 15% return on his investment of $100,000 in GOEM's mezzanine financing deal. See Complaint at ¶8(a) and (b). Sripadam claims this representation was false because Sir did not intend to use the money for a mezzanine financing project in South Korea and instead used it for gambling and to pay personal debts.

Sripadam failed to prove that Sir (or GOEM) made a false representation of fact at the time of this transfer and failed to prove a promise without intention to perform. It is undisputed that Sripadam transferred $100,000 to GOEM in April 2006. At trial, he argued that the $100,000 was "earmarked" to go directly to a vaguely described mezzanine financing deal in South Korea. A close review of the only documents offered in support of the transaction shows that this earmarking point fails. The April 10, 2006 email refers only to a "mezzanine

[sir.mukherjee.sripadam.final.memo.decis]    -20-

financing deal with an ipo track company" through an entity
called "Korean Technology Investment Corp." See Exh. 14. The
Letter refers to a "mezzanine financing project" in South Korea
by and between GOEM and an entity called "Korean Exchange
Bank." See Exh. 19. Sir's discovery responses denied that
GOEM had made any investments in which "KTIC" had participated.
See Exh. 29, Response to Interrogatory no. 19. At trial Sir
described GOEM losing $300,000 in some vaguely described
investment in South Korea.

While it is called a "letter of guarantee," Exhibit 19 is
in fact a promissory note made by GOEM by which GOEM promised
"as primary obligor" that *if* the investment "fails to perform
and fulfill the expected returns," GOEM agreed to "perform and
fulfill the expected return rate up to 15%" and GOEM
"unconditionally undert[ook]" to pay Sripadam "*if* the
"investment fails to earn expected returns up to 15%" upon his
demand. By its terms, the Letter was a promise by GOEM to
repay principal plus 15% to Sripadam no matter how the
"investment" performed. Thus, it does not support an
earmarking theory. Based on Exhibit 14, GOEM apparently
contemplated contributing $300,000 to some "mezzanine financing
deal" and Sripadam apparently believed his $100,000 was to go
to some such undertaking. However, he made a loan to GOEM that
required repayment by GOEM without regard to the performance of
any such investment.

Sir testified that the $100,000 was deposited into GOEM's
bank account but an equivalent amount had been allocated to an
investment in Korea. He claimed that the entire $300,000 GOEM

[sir.mukherjee.sripadam.final.memo.decis]   -21-

1  had devoted to this transaction was lost when one of the

2  parties involved absconded with the funds. Based on this

3  record, the court finds there was no false representation by

4  Sir in the Letter and the Letter does not support a finding

5  that Sir made a promise without an intention to perform.

6      **B. Non-Disclosure**

7      The Complaint alleges that Mukherjee learned in May 2006

8  that there were lawsuits pending against Sir and GOEM. <u>See</u>

9  Complaint at ¶7(g). Paragraph 7(m) of the Complaint also

10  alleges that Sir "concealed or suppressed the above-stated

11  facts with the intent to defraud and induce" Mukherjee to make

12  the $100,000 investment and provide consulting services. <u>See</u>

13  Complaint at ¶7(m). The phrase "the above stated facts"

14  apparently refers to all the prior allegations in paragraph 7

15  of the Complaint. However, Mukherjee focused his nondisclosure

16  theory on the alleged failure to disclose certain lawsuits

17  pending against GOEM or Sir.[13]

18      Concealment of a material fact that a party has a duty to

19  disclose can support nondischargeability of a debt on the

20  grounds of actual fraud. <u>Apte v. Japra, M.D., F.C.C., Inc. (In</u>

21  <u>re Apte)</u>, 96 F.3d 1319, 1323-24 (9th Cir. 1996). Relying on

22

23  _____

24      [13] GOEM's and Sir's statement of financial affairs list
    four breach of contract lawsuits, two of which were pending
25  and two of which had proceeded to judgment. See GOEM Docket
    no. 11; Sir Docket no. 12. The total owed to the two judgment
26  creditors was approximately $71,000 according to schedule F in
    each case. GOEM Docket no. 10, Sir Docket no. 11. It is
27  unclear what stage these disputes were in in May 2006. If the
    nondisclosure theory involves other allegations in paragraph 7
28  of the Complaint, it fails for the reasons articulated above.

[sir.mukherjee.sripadam.final.memo.decis]   -22-

the Restatement (Second) of Torts (1976) § 551, in <u>Apte</u>, the
Ninth Circuit explained that one party to a business
transaction is under a duty to exercise reasonable care to
disclose to the other party facts basic to the transaction if
he knows that the other is about to enter into it under a
mistake as to them, and that the other, because of the
relationship between them, the customs of the trade or other
objective circumstances, would reasonably expect a disclosure
of those facts. <u>Id.</u> at 1324.

There was no testimony regarding whether Mukherjee had
ever asked for financial disclosures regarding GOEM in advance
of the February 2006 "agreement" to advance the additional
$70,000. There was no evidence regarding the impact of these
lawsuits - if any - on GOEM's or Sir's viability. Nor was
there evidence showing that Mukherjee would not have proceeded
if he had known of these lawsuits. (In fact, at trial
Mukherjee admitted he had learned of their existence in April
2006 and made three or four additional transfers to Sir after
that. Tr. 36:4-9.) In this vacuum, it is impossible to assess
whether the existence of these lawsuits was material and
whether there were any objective circumstances supporting a
duty to disclose them. Mukherjee has failed to establish the
failure to disclose a material fact of the caliber that would
support a claim for non-disclosure under Bankruptcy Code
§ 523(a)(2)(A).

**C. Intent to Deceive**

Each plaintiff must also show Sir's intent to deceive him
through a false representation. This requires more than just a

Case: 07-05147   Doc# 43   Filed: 05/25/10   Entered: 05/26/10 13:37:53   Page 23 of
30

1    showing that Sir intended to deceive them into lending money
2    and later failed to repay it. "For actual fraud, the false
3    representation (whether express or implied) must be the vehicle
4    for the deceit. A free standing intent to deceive does not
5    support this element." Miller, 310 B.R. at 196. Because
6    intent to deceive is difficult to show, the court must consider
7    all of the facts and circumstances of the case to determine if
8    the requisite intent is present. Id. (citing Chevy Chase Bank
9    v. Briese (In re Briese), 196 B.R. 440 (Bankr. W.D. Wis.
10   1996)).

11        Neither Mukherjee nor Sripadam made a sufficient showing
12   of intent to deceive. As discussed above, the evidence did not
13   show a false representation by Sir to either of them. There
14   was also no evidence that Sir had the requisite intent to
15   deceive at the time the transfers were made by the plaintiffs.
16   The evidence showed an unpaid $30,000 gambling loan by
17   Mukherjee, an agreement to continue funding Sir's gambling with
18   an additional $70,000, and an apparent simultaneous agreement
19   to transform this gambling "bankroll" into an interest in GOEM
20   in order to achieve a greater chance of being repaid. The
21   evidence shows a failed investment by GOEM in an ill-defined
22   deal in South Korea and Sripadam's loan to GOEM to participate
23   in that deal. On this record, plaintiffs failed to prove an
24   intent to deceive coupled with a false representation.

25        In addition, on this record, there is no support for a
26   finding that Sir lacked the subjective intent to repay at the
27   time he or GOEM received Mukherjee's or Sripadam's cash. After
28   hearing the witnesses at trial and reviewing the documents

[sir.mukherjee.sripadam.final.memo.decis]   -24-

1   submitted into evidence, the court finds that at the time Sir

2   obtained plaintiffs' money he did in fact intend to repay them.

3   As the Bankruptcy Appellate Panel has said, "care must be taken

4   to stop short of a rule that would make every desperate,

5   financially strapped debtor a guarantor of his ability to

6   repay, on pain of nondischargeability." Karelin v. Bank of

7   America, NTSA (In re Karelin), 109 B.R. 943, 947 (9th Cir. BAP

8   1990).

9       Plaintiffs failed to show that Sir intended to deceive

10  them through false representations or promises made with no

11  intention to perform.  Their claims under § 523(a)(2)(A) fail

12  on this ground as well.

13  **D. Justifiable Reliance**

14      Even if Sir had made false representations in either of

15  the transactions with plaintiffs with the requisite intent to

16  deceive, the evidence does not show that either plaintiff

17  justifiably relied on the representations.  Justifiable

18  reliance takes into consideration the individual qualities and

19  characteristics of the particular plaintiff, and the

20  plaintiff's own capacity and knowledge from facts within his

21  observation. Field v. Mans, 516 U.S. 59, 71-72 (1995).

22  Whether a creditor justifiably relies on a representation by

23  the debtor is determined on a case by case basis.  Id.  As the

24  Ninth Circuit has explained:

25          The general rule is that a person may justifiably rely on
            a representation even if the falsity of the representation
26          could have been ascertained upon investigation.  In other
            words, negligence in failing to discover an intentional
27          misrepresentation is no defense.  However, a person cannot
            rely on a representation if he knows that it is false or
28          its falsity is obvious to him.  In sum, although a person

[sir.mukherjee.sripadam.final.memo.decis]   -25-

ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth.

<u>In re Eashai</u>, 87 F.3d at 1090-91.

Mukherjee testified he played poker at Bay 101 with Sir several nights a week during the time period relevant to this case. He was acutely aware of the depth of Sir's gambling habit. Mukherjee's testimony that he believed he was investing in GOEM by delivering large cash payments directly to Sir - while they were together playing poker at a casino - is simply not credible. In the context of this case, Mukherjee's claim of reliance on Sir's alleged representation that there would be a 20% return on an investment in GOEM - if that is what it was - is subjectively unjustified.

Sripadam also failed to prove justifiable reliance. Sripadam was, by his own description, an experienced investor, and an entrepreneur familiar with various means of investing in companies and loaning money to companies. He was also a regular poker player with Sir and Mukherjee at Bay 101. He understood the different types of documentation involved in different types of transactions. He did no due diligence - claiming he could simply "trust" the alleged "guarantee" by GOEM to return his principal in six months with at least 15% interest no matter how any "mezzanine financing" performed.

As explained above, a plaintiff may not blindly rely upon a representation if its falsity would be obvious if he made a cursory examination or investigation. Based on Sripadam's own description of his background and business experience, he knew

Case: 07-05147   Doc# 43   Filed: 05/25/10   Entered: 05/26/10 13:37:53   Page 26 of 30

there was no such thing as a "no risk" deal especially in the
context of "mezzanine financing" which he appeared to
understand entailed significant risk. His testimony also
showed that he understood that there were different ways to
document transactions – and understood the difference between a
loan, and a guarantee, and understood the different ways in
which a loan and an equity investment would be documented.
Coupled with this, he was aware of Sir's gambling problem and
acknowledged that in the past he had loaned money to Sir to
enable him to gamble. In the context of this case, Sripadam
had a duty to investigate the terms of this so-called mezzanine
financing transaction and at the very least ask to see the
documentation supporting it. Sripadam's claim that there was a
fraudulent promise upon which he justifiably relied fails.

### E. Mukherjee Has an Unenforceable Gambling Debt

Mukherjee's debt is clearly a gambling debt. Mukherjee
testified that he knew the transfers between September 2005 and
May 2006 were made to enable Sir to gamble. Sir also testified
that Mukherjee's money was used to fund his gambling. Exhibit
12 and Exhibit 17, prepared by Mukherjee, corroborated the
series of transfers and confirmed that Mukherjee had known the
use of the funds at the time of each advance.

Gambling debts are not enforceable in California.
California has a long-standing public policy against judicial
resolution of civil claims arising out of lawful or unlawful
gambling contracts or transactions. This prohibition applies
to actions for recovery of gambling losses and actions to
enforce gambling debts. <u>Kelly v. First Astri Corp.</u>, 72 Cal.

[sir.mukherjee.sripadam.final.memo.decis] -27-

App. 4th 462 (Cal. Ct. App. 1999).

California Civil Code § 1607 provides that the consideration for a contract must be lawful within the meaning of Civil Code § 1667. California Civil Code § 1667 provides that a contract is unlawful if it is "contrary to the policy of express law, though not expressly prohibited; or, otherwise contrary to good morals." See Union Collection Co. v. Buckman, 150 Cal. 159, 167 (Cal. 1907) (citing Cal. Civ. Code § 1607 and § 1667 and concluding that notes given for gambling debts were "contra bonos mores" and unlawful). As explained in Metropolitan Creditors Service of Sacramento v. Sadri, 15 Cal. App. 4th 1821 (Cal. Ct. App. 1993), the reasoning underlying California's deep-rooted policy against enforcement of debts incurred by gambling on credit is that the law should not invite gamblers to play themselves into debt, and the judiciary should not thereafter participate in their financial ruin.

While the LLC Documents are not equivalent to a promissory note or a check given in payment of a gambling debt, on the facts of this case, the court finds the LLC Documents were an effort to evade the rule that gambling debts are uncollectible and are based on illegal consideration. The testimony regarding the creation of the LLC Docuemnts was contradictory. Sir claimed the LLC interest was not given in payment of gambling debts and Mukherjee claimed - unconvincingly - that his money had gone into GOEM. It is undisputed that Mukherjee's funds were not put into GOEM and were used - with Mukherjee's knowledge - to finance Sir's gambling. It is clear that Mukherjee's $100,000 claim arises out of a gambling

[sir.mukherjee.sripadam.final.memo.decis]    -28-

transaction and its enforcement - either through the fiction of GOEM or otherwise - is barred as a matter of law.

### F. Consultant Fee

There is no § 523(a)(2)(A) cause of action as to the $30,000 consultant fee. At trial, Sir took the position that nothing was owed by GOEM because the consulting work was either not done or was not done well. His statement in Exhibit 13 acknowledging the obligation contradicts this. Mukherjee claimed to have worked full time for 3 months. This appears to be a factual dispute involving - at best - a breach of contract. It does not come within the parameters of § 523 even in the context of this case. If this arrangement was created to hide the gambling debt, it also fails for the reasons stated above.

## V. Conclusion

All parties in this case were habitual gamblers during the relevant time period. All of them approached this trial as just another hand to play in the resolution of their relationship. Based on the documentary evidence and testimony at trial, plaintiffs have not shown by a preponderance of the evidence that Sir obtained money from them by false pretenses, false representations, or actual fraud. Thus, Sir's debts to plaintiffs are dischargeable. In addition, $100,000 of Sir's debt to Mukherjee is based on loans Mukherjee made to Sir to enable Sir to gamble. This debt is therefore premised on illegal consideration and is unenforceable for that additional reason. The court will enter a judgment for Sir conforming with this decision.

[sir.mukherjee.sripadam.final.memo.decis]  -29-

1

2 **Court Service List** [by mail and ecf]

3

4 Plaintiffs' Counsel
Seth Weiner
5 Schein & Cai, LLP
111 W St. John St. #1250
6 San Jose, CA 95112

7 Defendant
Raymond J. Sir
8 1087 Foxhurst Way
San Jose, CA 95120
9
Courtesy copy
10 Cathleen Cooper Moran
Moran Law Group, Inc.
11 1674 N Shoreline Blvd. #140
Mountain View, CA 94043-1375
12
Plaintiff
13 Avi Mukherjee
6940 Burning Tree Court
14 San Jose, CA 95119

15 Plaintiff
Kumar S. Sripadam
16 17821 Vineland Ave.
Los Gatos, CA 95030
17

18

19

20

21

22

23

24

25

26

27

28

[sir.mukherjee.sripadam.final.memo.decis]  -30-